# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **PATTY SUE HUFF,** | ) | |
| Plaintiff, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| **v.** | ) | |
| | ) | |
| **SOUTHWEST VIRGINIA** | ) | |
| **REGIONAL JAIL** | ) | Civil Action No. 1:08cv00041 |
| **AUTHORITY, et al.** | ) | |
| Defendants | ) | |
| | ) | |
| | ) | **BY: PAMELA MEADE SARGENT** |
| | ) | **UNITED STATES MAGISTRATE JUDGE** |

This case comes before this court on the motion of the defendant, Southwest Virginia Regional Jail Authority, ("SWVRJA"), for summary judgment, (Docket Item No. 28). Patty Sue Huff, ("Huff"), the plaintiff, brought this case against defendants SWVRJA, and several individual defendants, individually and in their respective official capacities. In her Complaint, Huff seeks recovery under 42 U.S.C. § 1983,[1] for sex discrimination, the Age Discrimination in Employment Act of 1967, ("ADEA"), 29 U.S.C. §§ 621 *et seq*., for age discrimination, the Fourteenth Amendment for a violation of procedural due process, and wrongful discharge in violation of the Constitution of the Commonwealth of Virginia, Virginia state law and SWVRJA's own regulations and policies. Jurisdiction is conferred upon this court by

---

[1]The court notes that it incorrectly characterized Huff's sex discrimination claim in its Report and Recommendation as a Title VII claim. However, because Huff never filed a complaint with the Equal Employment Opportunity Commission, ("EEOC"), it must be pursued under 42 U.S.C. § 1983.

28 U.S.C. § 1331. The court previously dismissed Huff's sexual harassment claim against the individual defendants, her age discrimination claim against the individual defendants, her procedural due process claim in its entirety and her common law wrongful discharge claim in its entirety. That being the case, the only claims remaining before the court are Huff's sex discrimination claim against SWVRJA, as well as her ADEA claim against SWVRJA. The court notes, however, that Huff, in her response to the defendant's motion for summary judgment, concedes that she has no prima facie evidence of age discrimination. That being the case, the court will not consider this claim further and will recommend that it be dismissed from the plaintiff's case. The defendant's motion for summary judgment is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

## I. Facts

Since this case is before the court on a motion for summary judgment, the court must look to the evidence proffered by the parties in support of and in opposition to the motion to determine if there are any genuine issues of material fact. Having reviewed the evidence filed with the court, it appears there is not a genuine issue of material fact. The facts recited below have been gleaned from the evidence filed with the court and are undisputed for purposes of this motion unless noted otherwise.

Huff was employed as a full-time charge nurse for the Abingdon facility of SWVRJA, effective April 18, 2005. At her deposition, Huff testified that she was

hired by Beverly Lafferty, Director of Programs. (Exhibit B to Docket Item No. 35, ("Huff Depo."), 9.) Huff stated that she supervised the other nurses in the medical department, created schedules and was involved in the hiring of other nurses, among other things. (Huff Depo. at 10.) Huff testified that Dr. Kavah Ofagh, M.D., the Medical Director of the various SWVRJA facilities, whom she first met during her interview, "preferred male nurses" due to the "comments that he would make[,]" including, among other things, that women were nurses and men were doctors. (Huff Depo. at 12-13.) Huff testified that Dr. Ofagh made this comment more than once. (Huff Depo. at 13.) She further stated that Dr. Ofagh made it a point to meet a new male nurse, something that he did not do with female nurses. (Huff Depo. at 13.) Huff testified that Dr. Ofagh stated "several times" that Major Lambert, a female, did not need to be in the position that she was in. (Huff Depo. at 13-14.) Huff opined that Dr. Ofagh made this comment about Major Lambert because she was female. (Huff Depo. at 14.) She further testified that Dr. Ofagh would make comments about the female nurses being stupid and that he called Huff a "hillbilly" on several occasions. (Huff Depo. at 14.) Huff also testified that when she would call Dr. Ofagh regarding inmate care, he would ask her "is there anyone there that can look at it besides you." (Huff Depo. at 14.) She stated that he also would hang up on female nurses, but did not do so with male nurses. (Huff Depo. at 14.) Huff testified that Dr. Ofagh would yell at her, calling her and other female nurses stupid and incompetent. (Huff Depo. at 29.) She stated that Dr. Ofagh told one female nurse that she was "dumb, stupid and for her to read the nursing protocol and after she read that if she could comprehend it, then he would talk to her about an inmate." (Huff Depo. at 29.) Huff further testified that Dr. Ofagh would hang up on this particular nurse, after which Huff would call him back and tell him that she did not appreciate him speaking to the

nurse that way, that they respected him and that he should respect them and speak to them properly. (Huff Depo. at 29.) However, Huff testified that Dr. Ofagh would laugh, would call her stupid and dumb and tell her that she needed to be a "nursing home nurse" because that is where nurses like her worked. (Huff Depo. at 29-30.) She stated that Dr. Ofagh would make the same "nursing home" comment about another female nurse named Angie Counts. (Huff Depo. at 30.) Again, Huff testified that Dr. Ofagh did not treat the male nurses in such a manner, noting that he would "pat [them] on the back, tell them they were doing a good job." (Huff Depo. at 30.) Huff testified that Dr. Ofagh also commented that women "needed to be at home raising babies." (Huff Depo. at 54.) Huff testified that none of the male nurses ever reported to her any problems with Dr. Ofagh, nor was she aware of any such reports made to anyone else. (Huff Depo. at 63-64.)

Huff testified that Dr. Ofagh did not make any sexually harassing or sexual type comments to her specifically. (Huff Depo. at 15.) However, she relayed an incident with an agency nurse[2] who came to work with some type of drug impairment and who had to be sent home. (Huff Depo. at 15-16.) She stated that Dr. Ofagh "took it upon [him]self" to take her home, stating that she was a "very attractive lady." (Huff Depo. at 16.) Huff testified that the next day, this nurse reported that Dr. Ofagh had taken her to a motel. (Huff Depo. at 16.) However, Huff stated that she did not know whether he dropped her off or stayed with her at the motel. (Huff Depo. at 16-17.) Huff testified that she was unaware of any other sexually inappropriate behavior by Dr. Ofagh. (Huff Depo. at 17-18.)

---

[2]Huff explained that an agency nurse was a nurse sent to the jail by a staffing facility on a temporary basis. (Huff Depo. at 53.)

Huff testified that she was forced to resign on April 19, 2006. (Huff Depo. at 18.) She stated that, on that day, Major Matthew Pilkenton called her into his office. (Huff Depo. at 18.) When she entered his office, Tim Evans, the Director of Programs, also was there. (Huff Depo. at 19.) Huff stated that Major Pilkenton explained to her that she was an at will employee and stated "we're going to ask you to resign or we are going to let you go." (Huff Depo. at 19.) Huff testified that she was "totally shocked," but when she asked why she was being terminated, Pilkenton refused to discuss it with her, instead asking her to sign a resignation, which she did. (Huff Depo. at 19.) When she asked again why she was being terminated, he said "it was not open for discussion." (Huff Depo. at 19.) Then, according to Huff, Evans escorted her to the medical department to retrieve her personal belongings before escorting her to the parking lot. (Huff Depo. at 19-20.) Huff testified that Evans proceeded to tell her that he loved her, and because he was no longer her supervisor, they could have a relationship. (Huff Depo. at 20.) Huff stated that she left. (Huff Depo. at 20.) She testified that Evans had made comments to her in the past that he did not want her to look attractive at the jail, which she interpreted as his jealousy toward other employees. (Huff Depo. at 21-22.) Huff testified that Evans also made comments to other females at SWVRJA, including a female who worked in the commissary. (Huff Depo. at 25.) Specifically, he stated on more than one occasion that this female was pretty and that he would like to be with her, stating that he liked her breasts and that she looked good in her clothes. (Huff Depo. at 25-27.) Huff stated that Evans also would make comments about females' "ass[es]," stating that he would like to be with them. (Huff Depo. at 57-58.) Huff testified that Evans made these comments in the presence of several people, including herself, Benny Ringrose, Ira Franklin, Bill Hagy and Marsha Rasnake. (Huff Depo. at 26.) However, Huff

testified that she did not know if the commissary employee heard these comments. (Huff Depo. at 26.) Huff testified that she would tell Evans he should not say those things and she would usually leave. (Huff Depo. at 27.) However, she stated that she never complained to anyone in a position of authority about Evans. (Huff Depo. at 27.)

Huff clarified that Beverly Lafferty, Director of Programs, was her supervisor when she was hired at SWVRJA. (Huff Depo. at 22.) Lafferty's direct supervisor was Major Lambert. (Huff Depo. at 23.) However, she stated that Tim Evans later became Director of Programs and, therefore, her supervisor, a very short time after she was hired. (Huff Depo. at 22.) Evans's direct supervisor was Major Pilkenton. (Huff Depo. at 23.) Huff stated that while she worked with Dr. Ofagh, he was not her direct supervisor at the jail, but that he directed medical care issues when they arose. (Huff Depo. at 22.) Huff testified that she complained about Dr. Ofagh's comments to Lafferty, who spoke with Major Lambert. (Huff Depo. at 28.) She stated that this complaint to Lafferty occurred not long after she began her employment, and that Major Lambert, Lafferty and she discussed Dr. Ofagh's behavior. (Huff Depo. at 28.) Huff stated that Major Lambert told Dr. Ofagh he could not make such comments. (Huff Depo. at 28-29.) She testified that Dr. Ofagh's behavior improved for "a little while," but then "he started back again." (Huff Depo. at 29.) Thereafter, she stated that she complained to Evans several times about Dr. Ofagh's comments and inquired about a grievance process. (Huff Depo. at 28, 33.) Evans told her that he would "check on it," but she never got an answer. (Huff Depo. at 28, 31.) Huff testified that she did not recall receiving a copy of the personnel policies when she was hired. (Huff Depo. at 31-32.) She stated that she was unaware that a grievance procedure existed

for her to make a written report.  (Huff Depo. at 32.)  Huff admitted that she signed a receipt acknowledging that she received the employee handbook, but stated that she was "almost positive [she] didn't get one because [she] always ke[pt hers] cause [she had hers] that [she] carr[ies] all the time and any kind of employee guide, [she] always keeps it with [her] as a reference to use with [her] employees."  (Huff Depo. at 67.)  She further stated that she asked Dwayne Lockhart about the existence of a grievance procedure, but never got an answer.  (Huff Depo. at 28.)

Huff recounted one instance in which Dr. Ofagh was screaming at her regarding patient care, calling her a "hillbilly," "stupid" and "incompetent."  (Huff Depo. at 33-34.)  She stated that she informed Dr. Ofagh that when he could speak with her respectfully, she would be more than happy to speak with him and she hung up and called Evans to complain.  (Huff Depo. at 34.)  She stated that Dr. Ofagh already had called Evans to admit his behavior.  (Huff Depo. at 34.)  Evans agreed with Huff and stated that he would speak with Dr. Ofagh.  (Huff Depo. at 34.)  However, she did not think he ever did so.  (Huff Depo. at 34.)

Huff opined that she was forced to resign because she stated during a meeting with Dr. Ofagh, all the administrative nurses and the Director of Programs on April 18, 2006, the day before she was forced to resign, that Dr. Ofagh had treated her and her female nurses disrespectfully.  (Huff Depo. at 35-37.)  Huff testified that only one other individual complained of Dr. Ofagh's behavior that day.  (Huff Depo. at 37.)  At that meeting, Dr. Ofagh denied being disrespectful and stated that Huff was not telling the truth.  (Huff Depo. at 37.)

Huff testified that Major Pilkenton told her during their first conversation, shortly after she began working at SWVRJA, that he was not there to be a major forever, but that he was there "to get rid of the people that they want me to get rid of." (Huff Depo. at 38.) She further stated that she heard through the jail "grapevine" that Pilkenton had commented that there were too many women at the jail and he was going to weed them out. (Huff Depo. at 38.) She also had heard several people say that Pilkenton had commented that there were too many women from Russell County working at the jail and he was going to get rid of them. (Huff Depo. at 39.) Huff testified that she was from Russell County. (Huff Depo. at 39.) She conceded that she did not hear Pilkenton make either of these comments personally. (Huff Depo. at 39.) Huff also testified that she never heard Pilkenton make any sexually inappropriate remarks. (Huff Depo. at 40.)

Huff testified that she also worked with Lieutenant Terry Powers and that he and a nurse named Ginger McClure "had a liking for each other." (Huff Depo. at 40-41.) She stated that she had overheard Powers make comments to Ginger about her petite size, how attractive she was and about defending herself against an inmate. (Huff Depo. at 41.) However, Huff testified that she did not think that McClure found these comments unwelcome. (Huff Depo. at 41.)

Huff further testified that Dwayne Lockhart told her, without explanation, that she could not hire any nurses that "[had] looks." (Huff Depo. at 42.) However, Huff stated that final hiring decisions were not up to her, but the Director of Programs. (Huff Depo. at 43.) She testified that she was not aware of any nurse candidate ever being rejected due to her attractiveness. (Huff Depo. at 43.)

Huff also testified that she observed an incident between Arnie Reynolds, the Assistant Superintendent, and Pam Sizemore in the cafeteria, during which Reynolds kept rubbing up and down Sizemore's arm. (Huff Depo. at 48-49.) Huff stated that she did not think Sizemore even knew who Reynolds was at that time. (Huff Depo. at 49.) Huff could not recall whether Sizemore asked him to stop, but Sizemore later asked Huff who Reynolds was, stating that she was uncomfortable with his behavior. (Huff Depo. at 49-50.) Huff testified that she never observed Reynolds engaging in any other inappropriate behavior. (Huff Depo. at 50.)

Huff testified that Ricky Neece, a male, filled her position after she was terminated. (Huff Depo. at 54.) She also stated that she was told by Ron Atkins, a male nurse who worked at the Haysi facility of SWVRJA, that Dr. Ofagh offered him $40,000 and an apartment in if he would take Huff's position and if he would let Dr. Ofagh stay with him when he was in the area. (Huff Depo. at 64.) Huff testified that she believed Dr. Ofagh's permanent residence to be located in the Richmond, Virginia, area. (Huff Depo. at 64.) She stated that Atkins did, in fact, work at the Abingdon facility of SWVRJA after she left. (Huff Depo. at 65.) Huff testified that she had undergone a performance evaluation by Tim Evans close to the time that she was terminated, on which she was found deficient in no areas and received above average ratings in eight of 17 criteria. (Huff Depo. at 65.) Huff testified that no one in administration ever informed her that there were any problems with her job performance. (Huff Depo. at 66.)

SWVRJA has offered evidence by way of Huff's deposition testimony, Plaintiff's First Interrogatories To Defendant and an affidavit of Stephen O. Clear, the

Superintendent of SWVRJA since August 1, 2009. In his affidavit, Clear testified that during Huff's employment at SWVRJA, he was the Assistant Superintendent of the Regional Jail Authority. (Docket Item No. 36, ("Clear Affidavit"), 1.) He further testified that the individual hired to replace Huff was a female nurse named Anita Weber. (Clear Affidavit at 1.) He stated that Weber began employment on May 18, 2006, approximately one month following Huff's departure. (Clear Affidavit at 1.)

## II. Analysis

The defendant, SWVRJA, argues that summary judgment should be granted in its favor on Huff's sex discrimination claims on two grounds. First, SWVRJA argues that Huff cannot show a violation of § 1983 based on Dr. Ofagh's conduct because he is a private citizen and an independent contractor, not an employee of SWVRJA. Secondly, SWVRJA argues that Huff was terminated for making unprofessional comments and failing to meet the legitimate expectations of SWVRJA at the time she resigned.

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); s*ee Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Nguyen v. CNA Corp.*, 44 F.3d 234, 237 (4th Cir. 1995); *Miltier v. Beorn*, 896 F.2d 848, 850 (4th Cir. 1990); *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364-65 (4th Cir. 1985); *Cole v. Cole*, 633 F.2d 1083, 1090 n.7 (4th Cir. 1980). The plaintiff is entitled to have the credibility of all her evidence presumed. *See Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990). The party seeking summary judgment has the initial burden to show absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The opposing party must demonstrate that a triable issue of fact exists; she may not rest upon mere allegations or denials. *See Anderson*, 477 U.S. at 248. A mere scintilla of evidence supporting the case is insufficient. *See Anderson*, 477 U.S. at 248.

SWVRJA first argues that because Dr. Ofagh is a private actor and an independent contractor – not an employee – of SWVRJA, Huff cannot show a violation under § 1983 by SWVRJA. Aside from the defendant's response to Plaintiff's First Interrogatories To Defendant, (Exhibit B to Docket Item No. 29), which has been filed with the court, there is no evidence to show what Dr. Ofagh's employment relationship with SWVRJA is. In its response to these interrogatories, SWVRJA merely refers to Dr. Ofagh as an "independently contracted Physician" and "contracted Physician." Because no evidence of Dr. Ofagh's employment relationship with SWVRJA has been submitted for the court's consideration, it is impossible for the court to determine whether Dr. Ofagh is, in fact, an independent contractor of

SWVRJA.  However, the court need not decide this issue because, even assuming for the sake of argument that SWVRJA is liable for Dr. Ofagh's conduct, either because he is an independent contractor whose terms of employment are such as to subject SWVRJA to liability or because he is an employee of SWVRJA, I find that Huff's claims, nonetheless, cannot survive the defendant's motion for summary judgment.

## A.  Sex Discrimination

There are two types of sexual harassment claims.  These two types are hostile work environment and quid pro quo discrimination claims.  *See Spencer v. Gen. Elec. Co.,* 894 F.2d 651, 658 (4th Cir. 1990).  In this suit, Huff first claims that she was the victim of a hostile work environment as a result of the behavior of Dr. Ofagh, the Medical Director of the various SWVRJA facilities.

### 1.  Hostile Work Environment

The Supreme Court has said that Title VII[3] is violated when an employee suffers sexual harassment that is "sufficiently severe or pervasive 'to alter the conditions of . . . employment and create an abusive working environment.'" *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986) (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir. 1982)).  The prima facie case that the plaintiff must prove when bringing a hostile work environment claim is established if the plaintiff can prove:

---

[3]While *Meritor* was decided in the context of a Title VII case, the Fourth Circuit has held that courts may apply standards developed in Title VII litigation to similar litigation under § 1983.  *See Beardsley v. Webb*, 30 F.3d 524 (4th Cir. 1994).

> (1) unwelcome conduct; (2) that is based on the plaintiff's sex; (3) which
> is sufficiently severe or pervasive to alter the plaintiff's conditions of
> employment and to create an abusive work environment; and (4) which
> is imputable to the employer.

*Anderson v. G.D.C., Inc.,* 281 F.3d 452, 458 (4th Cir. 2002) (quoting *Conner v.
Schrader-Bridgeport Int'l, Inc.,* 227 F.3d 179, 192 (4th Cir. 2000)).

> Conduct that is not severe or pervasive enough to create an objectively
> hostile or abusive work environment – an environment that a reasonable
> person would find hostile or abusive – is beyond Title VII's purview.
> Likewise, if the victim does not subjectively perceive the environment
> to be abusive, the conduct has not actually altered the conditions of the
> victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993); *see also Lissau v. So. Food
Serv., Inc.*, 159 F.3d 177, 183 (4th Cir. 1998). Thus, there is both an objective, as well
as a subjective, component to making a prima facie hostile work environment claim.
The Supreme Court in *Harris* held that while "Title VII bars conduct that would
seriously affect a reasonable person's psychological well-being, . . . the statute is not
limited to such conduct." 510 U.S. at 22. Thus, in *Harris*, the Supreme Court held
that a plaintiff need not show that the alleged conduct "seriously affect[ed] [her]
psychological well-being" or led her to "suffe[r] injury," nothing that "[s]uch an
inquiry may needlessly focus the factfinder's attention on concrete psychological
harm, an element Title VII does not require." 510 U.S. at 22. The proper inquiry is
as follows: "[s]o long as the environment would reasonably be perceived, and is
perceived, as hostile or abusive, . . . there is no need for it also to be psychologically
injurious." *Harris*, 510 U.S. at 22. In 2000, the Fourth Circuit, pursuant to *Harris*,
included a fifth element to be considered in determining whether alleged conduct is

subjectively perceived as severe and pervasive – whether psychological harm resulted therefrom. *See Conner*, 227 F.3d at 193, 199. Of course, the court must be mindful of the Supreme Court's finding in *Harris* that the psychological impact need not be "serious." *See* 510 U.S. at 22. Nonetheless, under the relevant case law, it appears that the plaintiff must make some showing of a psychological impact resulting from the offending conduct as evidence that he or she perceived the atmosphere as hostile or abusive. However, I further note that "while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." *Harris*, 510 U.S. at 23.

> . . . [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* 510 U.S. at 23. The United States Supreme Court made clear in *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted), that "[s]imple teasing, off-hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."

Huff essentially argues that Dr. Ofagh was rude and disrespectful to herself and other female nurses by repeatedly calling them "stupid" and "incompetent," referring to her as a "hillbilly" on several occasions, stating that she and another female nurse needed to be "nursing home nurse[s]," hanging up the telephone on some female

nurses when they called to seek advice regarding inmate medical care, stating that women were nurses and men were doctors and stating that women, generally, should be home raising babies. Huff contends that none of the male nurses were treated in such a manner.

For the reasons that follow, I find that Huff cannot make a prima facie showing of hostile work environment. First, Huff has shown the conduct was unwelcome in that she has testified that she complained on numerous occasions to Dr. Ofagh, as well as her immediate supervisors, regarding Dr. Ofagh's comments and behavior. On one occasion, she even complained directly to Dr. Ofagh during a meeting with him and the majority of the administrative nurses from all of the SWVRJA facilities.

Moreover, I find that Huff has presented sufficient evidence to show that Dr. Ofagh's comments and behavior were based on her sex. Although the majority of Dr. Ofagh's comments were not *directly* related to gender, Huff has testified that he spoke only to the female nurses in such derogatory terms, including "stupid," "incompetent" and "hillbilly." Not only does Huff allege that Dr. Ofagh did not speak to the male nurses in such a manner, but that he made it a point to meet one of the new male nurses, something he never did with any of the female nurses, he would hang up the telephone on female nurses, which he did not do to male nurses, and he would "pat [the male nurses] on the back, tell them they were doing a good job." However, the court takes note of the fact that Dr. Ofagh did make at least a couple of comments that were directly related to Huff's gender by stating that women "needed to be home raising babies" and that men were doctors and women were nurses. For these reasons, I find that Huff has sufficiently shown that Dr. Ofagh's comments were based on her

gender.

Next, however, I find that Huff cannot show that Dr. Ofagh's comments and behavior were sufficiently severe and pervasive to alter Huff's conditions of employment and create an abusive work environment. As discussed earlier, this "severe and pervasive element" requires both an objective and a subjective showing. For the reasons set forth below, I find that Huff can make neither showing.

The factors that the court must consider in determining whether a plaintiff has shown that conduct was sufficiently severe and pervasive to create an abusive work environment are as follows: (1) the frequency; (2) the severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) what psychological harm, if any, the plaintiff suffered as a result thereof. Here, Huff has presented evidence that the conduct was frequent. While she has not specifically quantified the incidents of which she complains, she has specified several comments and behavior that occurred on more than one occasion, some directed only at her and some directed at other female nurses at SWVRJA. While Huff does not specify dates or timeframes during which this conduct occurred, I note that Huff worked at SWVRJA for only approximately one year, a relatively short period of time. Thus, I find that Huff can demonstrate that the behavior complained of was sufficiently frequent.

Next, as for the severity of the conduct, I find that Huff cannot make a sufficient showing. I find that most of Dr. Ofagh's comments would not rise above

the level of offensive remarks which the Supreme Court has held are not protected under Title VII. The Fourth Circuit has held that while Title VII prohibits a work environment that is "permeated with discriminatory intimidation," it does not establish a "general civility code" in the workplace. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Harris*, 510 U.S. at 21 and *Oncale v. Sundowner Offhsore Servs., Inc.*, 523 U.S. 75, 80 (1998)). Instead, to be actionable in a Title VII hostile work environment claim, the offending "conduct must be [so] extreme [as] to amount to a change in the terms and conditions of employment." *Sunbelt Rentals*, 521 F.3d at 315 (quoting *Faragher*, 524 U.S. at 788). The Fourth Circuit proceeded to observe that "[w]orkplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard" of a hostile work environment claim under Title VII. *Sunbelt Rentals*, 521 F.3d at 315. The court in *Sunbelt Rentals* held that the task on summary judgment with respect to the objective component of the "severe and pervasive" element of a Title VII hostile work environment claim is to identify situations that a reasonable jury might find to be so out of the ordinary as to meet the severe or pervasive criterion, that is, instances where the environment was pervaded with discriminatory conduct "aimed to humiliate, ridicule, or intimidate," thereby creating an abusive atmosphere. *Sunbelt Rentals*, 521 F.3d at 316 (quoting *Jennings v. Univ. of N.C.*, 482 F.3d 686, 695 (4th Cir. 2007)) (en banc) (citing *Meritor*, 477 U.S. at 65).

Here, I find that Dr. Ofagh's most egregious comment was that women should be home raising babies because such a comment indicates that women should not even

be part of the workforce, and for a supervisor[4] to be stating this to a subordinate is clearly severe in nature. The other comments, while clearly inappropriate and offensive, are not of the same magnitude as the comments and behavior that the Fourth Circuit has found sufficient to establish actionably severe or pervasive harassment. For example, in *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 238 (4th Cir. 2000), the Fourth Circuit reversed the entry of summary judgment for the defendant-employer where the plaintiff's supervisor directed "a barrage of threats and gender-based insults" at her more than 30 times in the first few weeks of her employment. This supervisor routinely directed demeaning comments at women, including that the only way a woman could get ahead at the bank was to "spread her legs." *Smith*, 202 F.3d at 239. The supervisor also told the plaintiff that she should carry out his orders "or else," and that he could "see why a man would slit a woman's throat," this latter comment being made after he spun the plaintiff around in her chair to face him. *Smith*, 202 F.3d at 239. Similarly, in *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 328-29, 333 (4th Cir. 2003) (en banc), the plaintiff was subjected to daily vulgar talk and antics of male colleagues in a work environment where the plaintiff was the sole female employee. The plaintiff's male colleagues simulated sex acts on mannequins, directed vulgar and sexually explicit jingles at the plaintiff and presented her with graphic pornography. *See Ocheltree*, 335 F.3d at 328; *see also EEOC v. R&R Ventures*, 244 F.3d 334, 337-40 (4th Cir. 2001) (male supervisor directed daily sexual jokes and discussions of sexual positions at 15-year-old employee, asked her if she liked to be spanked and frequently stated women were stupid compared to men; same supervisor constantly flirted with a 20-year-old

---

[4]While Dr. Ofagh was not one of Huff's immediate supervisors physically located at the jail, she testified that he did act in a supervisory capacity in that he directed the medical care of the inmates at the various SWVRJA facilities.

employee, repeatedly made sexual comments to her and belittled her in front of her co-workers); *Conner*, 227 F.3d at 193-99 (female employee was regularly mocked, ridiculed and physically threatened by male co-workers and was forced to remove the rags covering bloodstains on her pants after suffering uterine bleeding).

Instead, I find that Huff's complaints are more like the incidents alleged in *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766 (4th Cir. 1997). In that case, the Fourth Circuit affirmed the entry of summary judgment for the employer where, over a three-month period, the female plaintiff's male co-workers made the following comments: (1) that the male employees had made every female employee "cry like a baby" and would do the same to her; (2) that more "buxom" women were needed at the office; (3) asking the plaintiff if she would become a "mini van driving mommy;" and (4) that plaintiff should go home to "fetch [her] husband's slippers like a good little wife." *Hartsell*, 123 F.3d at 773. The court explained that the plaintiff's allegations "demonstrated only that [her co-workers] were unpleasant and sometimes cruel." *Hartsell*, 123 F.3d at 772. As discussed above, simple teasing, sporadic use of abusive language, off-hand comments, gender-related jokes, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. *See Faragher*, 524 U.S. at 788. I find that Dr. Ofagh's behavior – like the behavior alleged in *Hartsell* – falls into these categories. Additionally, I find that this case is like *Hartsell*, and unlike *Smith*, in another important respect: the behavior in *Smith* included physically threatening behavior, whereas *Hartsell* and the instant case do not. *See Smith*, 202 F.3d at 243. In particular, I note that Dr. Ofagh was not physically present at the Abingdon facility on a daily basis, and a lot of the comments and behavior alleged by Huff occurred by

way of telephone, especially during the last half of her employment at the Abingdon facility, when two other physicians were hired to make site visits at the facility. Further, a lot of Dr. Ofagh's comments were not directed at Huff exclusively, but at other female nurses at SWVRJA. The Fourth Circuit has indicated that such second-hand harassment, although relevant, is less objectively abusive than harassment directed only at the plaintiff. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (affirming summary judgment partly on the basis that some of the supervisor's conduct and sexual comments took place in group settings and were not directed at the plaintiff). Thus, I find that allowing Huff to pursue a cause of action, given these circumstances, would be inconsistent with controlling Fourth Circuit law.

With respect to the next factor to be considered in determining whether a work environment is hostile or abusive, I find that Huff cannot show that Dr. Ofagh's comments were physically threatening or humiliating. As just noted, none of Dr. Ofagh's comments were directly physically threatening to Huff or to any of the other female nurses. Moreover, the fact that Dr. Ofagh generally was not physically present at the Abingdon facility, especially during the second half of Huff's employment, further undercuts any such argument. While some of his comments, arguably, might be considered physically humiliating, i.e. that women should be home raising babies, the majority of Dr. Ofagh's comments should be classified as offensive utterances for the reasons already stated.

Further, I find that, in attempting to demonstrate the "severe and pervasive" element, Huff cannot show that Dr. Ofagh's conduct unreasonably interfered with her

work performance. She did not testify that her work performance suffered in any way as a result of Dr. Ofagh's allegedly harassing comments and behavior. In fact, Huff testified that she had undergone a performance evaluation by Tim Evans, Director of Programs and her direct supervisor, close to the time that she was forced to resign, on which she was found deficient in no areas and received above average ratings in eight of 17 criteria. Huff further testified that no one in administration ever informed her that there were any problems with her job performance.

With regard to the last factor to be considered in determining whether Huff can meet the "severe and pervasive" element of a hostile work environment claim, I find that she has offered insufficient evidence that she subjectively perceived her work environment as abusive or hostile. Particularly, she has alleged no effect on her work performance as a result of any psychological impact on her as a consequence of Dr. Ofagh's conduct to evidence such a subjective perception. For instance, Huff has not alleged that she altered her normal work routine in any fashion, missed work or that she experienced psychological stress or any stress-related physical symptoms such as headaches, nausea or crying. In short, Huff has offered no evidence from which the court can find that she subjectively perceived her work environment to be hostile or abusive.

Lastly, the court finds that Huff cannot meet the final element of a prima facie case for hostile work environment, in that she cannot show, at this stage, that Dr. Ofagh's conduct is imputable to SWVRJA. As discussed earlier, she has offered no evidence to rebut the defendant's contention that Dr. Ofagh is an independent contractor, not an employee of SWVRJA. While plaintiff's counsel, at the September

23, 2009, hearing on this matter, suggested the need for further discovery on this issue – in particular the need to depose Dr. Ofagh, whose deposition had not yet been scheduled – the court notes that counsel has failed to file a Rule 56(f)[5] affidavit stating the same. Moreover, the court would not be inclined to entertain any such affidavit at this late stage in the plaintiff's case. It is the plaintiff who bears the burden of proof on this element, and the court finds that she simply has failed to demonstrate its existence.

For all of the above-stated reasons, I find that a reasonable jury could not find for Huff on her hostile work environment claim. That being the case, I recommend that the court grant summary judgment in SWVRJA's favor on this claim.

### 2. Disparate Treatment

Huff also argues that she was a victim of disparate treatment by SWVRJA in that male nurses were not treated with the same disrespect as female nurses. She also alleges that she was terminated on the basis of her sex, noting that Major Matthew Pilkenton, the individual who actually informed her of her termination, had stated that there were too many females working at the jail and that he intended to weed them out. SWVRJA argues that Huff cannot, as a matter of law, demonstrate a prima facie case of disparate treatment. When a plaintiff in a Title VII case has only indirect

---

[5]Federal Rule of Civil Procedure 56(f) states, in relevant part, as follows: "If a party opposing the [summary judgment] motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken. . . ." FED. R. CIV. P. 56(f)(2).

evidence of discrimination, then the burden shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), applies. "Direct evidence of discrimination is evidence which, if believed, would prove the existence of a fact . . . without any inference or presumption." *O'Connor v. Consol. Coin Caterers Corp.*, 56 F.3d 542, 548 (4th Cir. 1995) (quoting *Bodenheimer v. PPG Indus., Inc.*, 5 F.3d 955, 958 (5th Cir. 1993)). Because Huff merely states that she heard "through the grapevine" that Pilkenton had made comments regarding the existence of too many females whom he intended to weed out, she has only indirect evidence of discrimination. That being the case, the *McDonnell Douglas* burden shifting framework applies. Under *McDonnell Douglas*, a plaintiff in a Title VII case carries the initial burden of establishing a prima facie case of discrimination. Pursuant to *McDonnell Douglas*, a plaintiff in a Title VII case relying on indirect evidence establishes a prima facie case of discrimination by showing the following: (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class. *See Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc). Under the *McDonnell Douglas* framework, if a plaintiff makes a prima facie case of discrimination, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's action. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the defendant does so, then the plaintiff must demonstrate that the proffered reason was not the true reason for the employment decision. *See Burdine*, 450 U.S. at 256.

Here, SWVRJA does not dispute that Huff was a member of a protected class and that she suffered an adverse employment action. SWVRJA does dispute that Huff was meeting its legitimate expectations at the time of her termination and that her position remained open or was filled by similarly qualified applicants outside of the protected class. In particular, SWVRJA argues that, if Dr. Ofagh's statements were accepted as true – that she was "stupid" and "incompetent," then she clearly was not meeting SWVRJA's legitimate expectations. The court is not persuaded by such a circular argument. Simply calling someone stupid and incompetent does make them so. Moreover, viewing the facts in the light most favorable to Huff, specifically given the favorable performance evaluation and lack of any formal criticism of her job performance by any supervisor, the court finds that, at the very least there is a dispute in fact on this issue. I also note that there is a genuine dispute in fact as to whether Huff's position was filled by a similarly qualified applicant outside of the protected class. Huff testified at her deposition that Ricky Neece, a male, filled her position after she was forced to resign. Stephen Clear, the current Superintendent, testified in a sworn affidavit that Huff was replaced by a female nurse named Anita Weber. Thus, for these reasons, I find that Huff has made a prima facie showing of discrimination under *McDonnell Douglas*. Nevertheless, I find that SWVRJA has supplied sufficient evidence demonstrating a nondiscriminatory reason for Huff's termination. In particular, in its response to the plaintiff's interrogatories, SWVRJA stated that Huff was terminated due to unprofessional conduct and statements by Huff during a meeting with Dr. Ofagh and other nurses the day prior to her termination. Although SWVRJA did not elaborate what such unprofessional comments and conduct consisted of, it has, at least for purposes of the summary judgment motion now before the court, articulated a legitimate, nondiscriminatory reason for her forced resignation.

That being the case, the burden is on the plaintiff to show that SWVRJA's proffered nondiscriminatory reason for her forced resignation is merely pretext. However, Huff has failed to come forward with any such evidence, thereby failing to carry her burden.

Therefore, for all of these above-stated reasons, I find that a reasonable jury could not return a verdict for Huff on her disparate treatment claim, and I recommend that the court grant the defendant's summary judgment motion on this claim.

## PROPOSED FINDINGS OF FACTS AND
## CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. The plaintiff was forced to resign from her position as a charge nurse at SWVRJA on April 19, 2006;

2. In order to demonstrate a prima facie case for hostile work environment, a plaintiff must show: (1) unwelcome conduct; (2) based on the plaintiff's sex; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer;

3. The "severe or pervasive" element contains both an objective and a subjective component;

4. To determine whether a work environment is hostile or abusive, the court may look to the following factors: (1) frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere

offensive utterance; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether psychological harm resulted therefrom;

5. While a reasonable person could find that the conduct alleged by Huff was frequent, a reasonable person could not find that it was severe, physically threatening or humiliating or that it interfered with her work performance;

6. Thus, Huff fails to meet the objective component of the "severe and pervasive" element;

7. Huff has failed to allege any impact that the offending behavior had on her personally; thus, she cannot meet the subjective component of the "severe and pervasive" element;

8. Thus, no reasonable jury could find that Huff can demonstrate a prima facie showing for a hostile work environment claim;

9. Therefore, the defendant is entitled to summary judgment on Huff's hostile work environment claim;

10. Under the *McDonnell Douglas* burden shifting framework, a plaintiff alleging disparate treatment must first make a prima facie showing of discrimination by demonstrating the following: (1) she is a member of a protected class; (2) she suffered adverse employment action; (3) she was performing her job duties at a level that met her employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or was filled by similarly qualified applicants outside of the protected class;

11. If a plaintiff makes a prima facie case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employer's action;

12. If the defendant articulates such a legitimate, nondiscriminatory reason, the

burden shifts back to the plaintiff to show that the proffered reason is pretextual;

13. While Huff can make a prima facie case for discrimination, SWVRJA has met its burden of showing a legitimate, nondiscriminatory reason for her termination;

14. Huff has not offered any evidence to show that the defendant's nondiscriminatory reason for her forced resignation is pretextual;

15. Therefore, the defendant is entitled to summary judgment on Huff's disparate treatment claim;

16. The plaintiff has conceded that she cannot make a prima facie showing of age discrimination; and

17. Therefore, this claim should be dismissed from the plaintiff's case.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court grant the Defendant's Motion For Summary Judgment, (Docket Item No. 28). I further recommend dismissing Huff's age discrimination claim.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of

court.  A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objection to these proposed findings and recommendations within 10 days could waive appellate review.  At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable Glen M. Williams, Senior United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record.

DATED: This 13th day of October 2009.

/s/ Pamela Meade Sargent
UNITED STATES MAGISTRATE JUDGE